2003 VT 17

# State of Vermont v. Homeside Lending, Inc. and BankBoston Corporation

[826 A.2d 997]

No. 99-265

Present: **Dooley, Morse,**[1] **Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned**

Opinion Filed February 21, 2003
Motion for Reargument Denied April 15, 2003

*William H. Sorrell*, Attorney General, and *Elliot Burg*, Assistant Attorney General, Montpelier, for Plaintiff-Appellant.

*Robert S. DiPalma* of *Paul, Frank & Collins, Inc.*, Burlington, and *Jeffrey B. Maletta, Daniel J. Tobin* and *Lancelot A. King* of *Kirkpatrick & Lockhart LLP*, Washington D.C., for Defendants-Appellees.

*David L. Shapiro* and *Susan P. Koniak*, Cambridge, Massachusetts, and *Jonathan S. Massey*, Washington, D.C., for Amici Curiae Law Professors Supporting the State of Vermont.

---

[1] Justice Morse sat for oral argument but did not participate in this decision.

240

*Philip T. McLaughlin,* Attorney General, and *Walter L. Maroney,* Senior Assistant Attorney General, Concord, New Hampshire, for Amici Curiae States In Support of State of Vermont.

¶ 1. **Dooley, J.** The State of Vermont appeals from a decision of the Chittenden Superior Court granting summary judgment to defendants, Homeside Lending, Inc. and BankBoston Corporation, on the grounds that this litigation is precluded by a national class action judgment by the Mobile, Alabama circuit court in *Hoffman v. BancBoston Mortgage Corp.,* No. CV-91-1880 (Ala. Cir. Ct. Jan. 24, 1994). In this action, the State alleges that defendants violated the Vermont Consumer Fraud Act, Vermont's mortgage escrow account statute, and its fiduciary duties and contractual obligations in implementing the Alabama judgment with respect to Vermont mortgagors who were class members because of their mortgages with defendants. The State argues on appeal that the superior court's preclusion decision was erroneous because (1) the Alabama circuit court's assertion of personal jurisdiction over Vermont class members was defective because it violated their due process rights, and (2) even if Vermont mortgagors are precluded by the Alabama judgment from raising the claims asserted in this case, the State is not precluded. We agree with the first argument, do not reach the second, and reverse.

¶ 2. The events underlying *Hoffman* and this lawsuit are notorious, having been the subject of extensive news and academic commentary. See M. Shadur, *The Unclassy Class Action,* 23 No. 2 Litig. 3 (Winter 1997); S. Koniak & G. Cohen, *Under Cloak of Settlement,* 82 Va. L. Rev. 1051, 1068 (1996); B. Meier, *Math of a Class-Action Suit: 'Winning' $2.19 Costs $91.33,* N.Y. Times, Nov. 21, 1995, at A1; J. Quinn, *Fighting the System, Everywhere,* Newsweek, Oct. 2, 1995, at 71. The controversy arises out of real estate loans that Bank of Boston Corporation made to Vermont homeowners, as well as to those from other states, that were serviced by BancBoston Mortgage Corporation. The names of these corporations have changed respectively to BankBoston Corporation and Homeside Lending, Inc., the defendants in this case.

¶ 3. In 1991, Carl and Deborah Hoffman, mortgagors on a mortgage held by Bank of Boston Corporation and serviced by BancBoston Mortgage Corporation, brought a national class action against these corporations in the Alabama circuit court alleging that the mortgagees required the mortgagors to maintain excessive amounts — that is, amounts in excess of those authorized by the mortgage contract — in an escrow account to cover realty taxes, insurance, and other assessments. The class contained more than 300,000 mortgagors from a number of states, including Vermont. Since the defendants in that case, and those in

this case, are identical, except for the change of names, we will hereafter refer to them as defendants.

¶ 4. Defendants offered to settle the *Hoffman* suit, even before it was certified as a class action, by releasing some of the money in each of the escrow accounts and paying $500,000 in attorney's fees to plaintiffs' counsel. That offer was rejected, and on July 2, 1992, the suit was certified as a class action. On October 12, 1993, the Alabama court ruled on summary judgment that defendants had required that mortgagors hold in the escrow accounts amounts in excess of those authorized by the mortgage contracts. Thereafter, on November 9, 1993, the parties entered into a "global" settlement which received preliminary approval from the court on December 6, 1993. The approval order provided for notice to class members, which included a description of the proposed settlement, a form for requesting exclusion from the class, a form to give notice of objection to the settlement, and a form indicating participation in a subclass. The notice was sent by first-class mail and published in USA Today.

¶ 5. Some members of the class opted out, but most did not. Approximately 200 class members indicated an intent to appear and object to the settlement, but only the Florida Attorney General appeared at the January 10, 1994 fairness hearing to object to the settlement terms. The Alabama court approved the settlement, finding that it benefitted the class members by lowering escrow amounts in the future, requiring a refund of part of the existing escrow amounts, and paying them interest on the escrow amounts improperly held by defendants in the past. The interest payments under the settlement were $8.76 for existing mortgagors and $1.78 for past mortgagors.

¶ 6. The impetus for this action is the attorney's fee awarded to class counsel. The settlement provided that the attorney's fee would be a percentage "of the economic benefit conferred on the class" as determined by the court. The notice to the class members contained the following paragraph entitled "ATTORNEYS' FEES AND COSTS":

> Counsel for plaintiffs and the class will request the Court to award them a reasonable attorney's fee to be paid out of each escrow account based on the benefit conferred on the class after BancBoston has performed the analysis set forth in paragraphs 3(b), (c), and (d) of this Notice. Counsel for the plaintiffs and the class will request a percentage not to exceed one-third of the economic benefit conferred that is more fully described in this Notice and the Consent Decree. The Court will decide whether or not to award attorneys' fees out of the benefit conferred at

the fairness hearing set for January 10, 1994. BancBoston has agreed not to challenge or object to plaintiffs' counsel request. . . . BancBoston will distribute the above fees, costs and expenses *to counsel for plaintiffs and the class on a monthly basis after the analysis set forth in paragraphs 3(b), (c) and (d) has been performed.*

Paragraphs 3(b), (c), and (d), referenced in the attorney's fees paragraph, specified how BancBoston was to calculate escrow amounts under the settlement and what it was to do with excess escrow amounts.[2] The

---

[2] The provisions state:

(b) BancBoston will use the aggregate method of analysis in the calculation and accumulation of escrow deposits and may maintain a maximum of a two-month reserve in any given escrow account, except as otherwise provided in paragraph 3(d) of this Notice. At its customary annual analysis of each current and future mortgagor's escrow account (or more frequently if BancBoston so elects), BancBoston will prepare a running trial balance projection setting forth expected mortgage payment receipts, projected escrow disbursements, and expected escrow balances for the analysis period beginning with the date any change made in the amount of the mortgagor's payment as a result of the annual analysis becomes effective ("trial balance"). (By way of example, for an annual analysis performed in September, 1993, with an effective payment change date of November 1, 1993, BancBoston will prepare a trial balance from November 1, 1993 to October 31, 1994. BancBoston will calculate the trial balance based on BancBoston's reasonable estimate of the amounts of the items to be disbursed from the escrow account during the analysis period.).

In preparing the trial balance, BancBoston will assume the disbursement of an escrow item, in any given month, will post-date BancBoston's receipt of the mortgagor's mortgage payment for that month, except that BancBoston will be entitled to assume the disbursement of an escrow item whose projected disbursement date is from the first through the fifteenth day of the month, will predate BancBoston's receipt of the mortgagor's mortgage payment for the month of disbursement. To the extent BancBoston cannot project an expected disbursement date within a given month, BancBoston agrees that it will assume the receipt of the mortgagor's mortgage payment will predate disbursement of the related escrow item.

(c) To the extent the expected lowest balance in the escrow account exceeds one-sixth (1/6) of the anticipated total amount of the escrow items that are due during the analysis period ("1/6 low point"), then BancBoston will: (1) automatically prorate the determined surplus and reduce the mortgagor's payments (except in those states that do not permit applying the surplus in this manner); or (2) upon request, refund the surplus to the mortgagor; or (3) upon request, apply the surplus to principal; or (4) upon request, apply the surplus to the next payment(s), provided that the mortgage is not in default, otherwise delinquent, or the resulting escrow on deposit is not less than the escrow needed for future escrow disbursements. Notwithstanding the foregoing, BancBoston may collect and hold an amount exceeding the 1/6 low point set forth above if the mortgagor so requests.

(d) BancBoston will use the aggregate method of analysis and reasonable estimates of future disbursements (subject to the terms of paragraph 3(a)) in the calculation and accumulation of escrow deposits and shall maintain: (i) no reserve in the escrow account with respect to FNMA/FHLMC mortgages that contain language substantially the same as the

attorney's fees paragraph references an "economic benefit conferred that is more fully described in this Notice." Apparently, this reference is also to paragraphs 3(b), (c) and (d), although these paragraphs do not attempt to describe the extent of the economic benefit conferred on class members.

¶ 7.  Class counsel presented evidence at the fairness hearing in support of their request for an attorney's fee. Because defendants in the settlement had agreed not to oppose any fee amount class counsel requested, they were silent on the issue. The circuit court summarized class counsels' position as follows:

> Class counsel submitted the affidavit of Mr. Michael Koster, Senior Vice-President of BancBoston who testified that under the last analysis performed by BancBoston, the difference in the escrow account portfolio between the new and old methodology was 19%. Class counsel proposed that attorneys' fees be awarded as one-third of 19% of the balance reflected in the escrow accounts at the time that the annual escrow analysis is calculated.

Order of Settlement Approval and Final Judgment, *Hoffman v. BancBoston Mortgage Corp.*, No. CV-91-1880, slip op. at 9 (Ala. Cir. Ct. Jan. 24, 1994). Based on its evaluation of the amount of work undertaken by class counsel and the "unprecedented results achieved," the court found that counsel was entitled to an attorney's fee "based on a percentage of the economic benefit conferred" by the settlement. It awarded 28% of 19% of the escrow account amounts of class members to be deducted monthly and sent to class counsel. Although there is some disagreement about the final amount of the attorney's fee awarded, it is between 8 and 11.7 million dollars.[3]

---

language contained in the documents attached to the Consent Decree and that were entered into prior to September 1, 1990, and (ii) one month's reserve in the escrow account with respect to (a) VA mortgages and (b) FHA mortgages that contain language substantially the same as the language contained in the documents attached to the Consent Decree as Appendix B and that were entered into prior to September 1, 1990. The aggregate projected escrow account balance for these mortgages shall be anticipated to fall to zero or one-twelfth (1/12), as the case may be, at least once during the twelve (12) month period following the effective payment change date. BancBoston shall treat surpluses in accordance with the provisions of paragraph 3(c)(1)-(4) of this Agreement and shall treat shortages in accordance with the provisions of paragraph 3(f) of this Agreement. Notwithstanding the foregoing, BancBoston may collect and hold an amount exceeding the zero low point set forth above if the mortgagor so requests.

[3] The evidence at the fairness hearing in the Alabama circuit court suggested that class counsel expected to be paid approximately $14 million if they were awarded a third of the amount released from the escrow accounts plus the interest on the released amounts. The

¶ 8. After defendants began implementing the settlement, its economic implications became more apparent. In understanding the impact of the settlement on the mortgagor class members, we are aided by the extensive literature about the settlement terms. We recognize some of the claims of the economic value of the settlement are disputed, but since this action was dismissed with no factual development beyond the various papers and orders in *Hoffman,* the analyses in the literature are particularly relevant to understand the allegations contained in plaintiffs' complaint.[4]

¶ 9. As Professors Koniak and Cohen explained in their law review article analyzing the *Hoffman* settlement:

> Class counsel asked for attorney's fees equaling 33 1/3% of all the money the bank was wrongfully holding in escrow; that is, one-third of all the excessive cushion money. The trick was in characterizing all that money as money recovered by this lawsuit. Had there been no lawsuit, 100% of the excess cushion would have been returned to class members at the time their mortgages were repaid. Therefore, what the lawsuit recovered for each class member was (in addition to the back interest) only the difference between the value of the excess cushion money in the class member's hands today and the value of the money had

---

comparable amount for the reduced percentage fixed by the court would be $11.7 million. Descriptions of the litigation have generally estimated a lower amount closer to the $8 million floor.

[4] The context of this case is highly unusual, arising from the notoriety accorded the underlying action. Defendants filed a motion to dismiss or for summary judgment, attaching all the relevant documents from the *Hoffman* litigation and authenticating them by an affidavit of defendants' counsel in *Hoffman.* There is no dispute over the accuracy or relevancy of those documents, but they do not address at all the central fact that has made *Hoffman* notorious — that is, the allegation, supported by academics and other commentators, that many of the absent class members ended up paying more in attorney's fees to class counsel than the economic benefit they received from "prevailing" in the litigation. The notoriety is, of course, amplified by the size of the attorney's fees awarded to class counsel.

We could attempt to ignore all of the commentary about the *Hoffman* and related cases, but that would be difficult in this situation and deprive us of important aspects of the context in which the issues arise. We do not choose this course of action for these and other reasons. Defendants have not attempted to defend by denying the allegations about the unfairness of the *Hoffman* settlement. Moreover, any adjudication of the merits of this case will necessarily require an examination of this fairness question, and, thus, denial of the motion to dismiss/ motion for summary judgment does not deprive defendants of the opportunity to raise factual issues. Thus, we have treated the factual representations in the various discussions of *Hoffman* and related cases as part of the State's allegations where they aid the State's position.

the bank held it until the mortgage was paid off. The lawsuit and class counsel did not "recover" the excessive cushion money being held in escrow because that money was never lost. All that the class members had lost by the bank's allegedly wrongful acts was the use of that money today and the use of that money in years past.

S. Koniak & G. Cohen, *Under Cloak of Settlement*, 82 Va. L. Rev. at 1063. Consistent with this explanation, the authors calculated the value of the settlement under a number of scenarios.[5] In one, the attorney's fees were about four times the recovery; in another about forty times the recovery; and in another, there was no recovery, so the attorney's fees were infinity times the recovery. See *id.* at 1064-68. They noted that any class member who paid more in attorney's fees than he or she recovered "would have been better off if class counsel had lost the case." *Id.* at 1068.

¶ 10. The complaint in this case does not allege the exact loss to Vermont consumers as a result of the settlement. It does allege that approximately 900 of the 300,000 persons in the class were Vermont residents and that they paid at least $30,000 in attorney's fees. Further, it alleges that the settlement was of no value to them because Vermont law, 8 V.S.A. § 1260(b) (Cum. Supp. 2000) (recodified at 8 V.S.A. § 10404), requires that interest be paid on home loan escrow funds at the prevailing savings account rate.

¶ 11. The litigation did not end with the approval of the settlement by the Alabama court. Two class members from Maine and one from Wisconsin sued class counsel and the defendants in *Hoffman*, alleging violations of the RICO and Civil Rights Acts as well as fraud, negligent misrepresentation, attorney malpractice, breach of fiduciary duty, and conversion. See *Kamilewicz v. Bank of Boston Corp.*, 1995 WL 758422 (N.D. Ill. 1995) (*Kamilewicz I*). The federal court dismissed the case for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine, a rule that prevents lower federal courts from hearing appeals of state actions,[6] based on its conclusion that the federal court would have to

---

[5] It is unclear whether it is alleged that all persons lost money or only some did. It would appear that at least several thousand class members received no economic benefit beyond a nominal interest payment, but paid an attorney's fee. See Meier, *supra*, at D6. The one class member whose story has been widely told apparently received no economic benefit other than $2.19 in interest, but paid an attorney's fee of $91.33. *Id.* at A1.

[6] The *Rooker-Feldman* doctrine is the product of two Supreme Court decisions, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983). As one recent commentator explained: "Despite receiving very little treatment by the Supreme Court, *Rooker-Feldman* has experienced 'explosive growth' in lower federal courts,

improperly review the Alabama court actions in order to grant relief. The district court opinion was affirmed by the United States Court of Appeals for the Seventh Circuit, *Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506 (7th Cir. 1996) (*Kamilewicz II*), and a request for rehearing en banc failed on a 6-to-5 vote, over a lengthy dissent by Judge Easterbrook. *Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348 (7th Cir. 1996) (*Kamilewicz III*).[7]

¶ 12. While the federal action was pending, class counsel sought an injunction against the *Kamilewicz* plaintiffs in the Alabama circuit court arguing that they were bound by the Alabama orders. The *Kamilewicz* plaintiffs refused to appear, alleging that the court had no jurisdiction over them. The court found that it did have jurisdiction over the class members for the same reason that it asserted jurisdiction initially, found again that the settlement was fair and reasonable, and found that class counsel's representation was adequate. It further found that defendants did not violate their fiduciary obligations as escrow agents with respect to the attorney's fees taken from the escrow accounts. It held that the *Kamilewicz* plaintiffs "are bound by the Order of Settlement and are precluded from reasserting the claims dismissed in the Federal Class Action in any forum." Order Denying Motion to Set Aside Order of Settlement, *In re Kamilewicz*, No. CV-91-1880, slip op. at 10 (Ala. Cir. Ct. Jan. 30, 1996).

¶ 13. When the law firm that represented the *Hoffman* plaintiffs brought a suit against the *Kamilewicz* plaintiffs and their counsel for malicious prosecution, the Alabama Supreme Court granted a writ ordering the circuit court to dismiss the action for lack of personal jurisdiction. *Ex parte Kamilewicz*, 700 So. 2d 340 (Ala. 1997). The court concluded that neither the inclusion of the *Kamilewicz* plaintiffs in the *Hoffman* class nor service of process in Alabama on class counsel and an accountant created personal jurisdiction over the *Kamilewicz* plaintiffs and their counsel. *Id.* at 347.

---

where the number of cases relying on the doctrine is astonishing." Comment, *The Rooker-Feldman Doctrine: Toward a Workable Role*, 149 U. Pa. L. Rev. 1555, 1556 (2001).

[7] Apart from the other aspects of this case, the *Kamilewicz* decision is itself notorious, having been subject to extensive critical comment by academics. See Comment, *supra*, note 6, at 1573 (characterizing *Kamilewicz* as an "egregious example of . . . confusion and misapplication" of *Rooker-Feldman* doctrine); J. Beermann, *Comments on Rooker-Feldman or Let State Law Be Our Guide*, 74 Notre Dame L. Rev. 1209, 1232 (1999) (observing that the *Kamilewicz* decision is a "cause célèbre among law professors"); S. Bandes, *The Rooker-Feldman Doctrine: Evaluating its Jurisdictional Status*, 74 Notre Dame L. Rev. 1175, 1200 (1999) (describing result in *Kamilewicz* as "outrageous").

¶ 14. This brings us to the current suit. In this suit, the State alleges that defendants (1) violated the Vermont Consumer Fraud Act by (a) sending a misleading notice to Vermont members of the class, (b) deducting attorney's fees paid to class counsel from Vermont mortgagors' escrow accounts, and (c) deducting the attorney's fees from the escrow accounts without disclosing the purpose of the deduction; (2) violated 8 V.S.A. § 1260 by deducting the attorney's fees paid to class counsel from the escrow accounts of Vermont mortgagors; (3) breached their fiduciary duty to Vermont mortgagors by deducting the attorney's fees from their escrow accounts; and (4) violated their contractual duty to Vermont mortgagors by deducting the attorney's fees from their escrow accounts. The suit seeks an injunction against the above illegal acts; a refund of all monies deducted from Vermont mortgagors' escrow accounts; a civil penalty for violations of the Consumer Fraud Act; appropriate sanctions for the other violations; and an award of costs.

¶ 15. Defendants moved to dismiss the suit, or alternatively for summary judgment, arguing that the State is precluded from attacking the Alabama judgment here. The superior court agreed, finding that this suit was "an improper and ill-disguised effort to overcome the preclusive effect of the Alabama judgment." The court held that the Vermont mortgagors who were part of the *Hoffman* class were precluded from collaterally attacking the judgment, including the award of attorney's fees. It then found that preclusion also applied to the State because it was using its parens patriae power on behalf of the "same, narrow, precisely defined group of Vermont mortgagors who were parties to the Alabama decision and are precluded by its finality."[8]

¶ 16. We note that the superior court judgment rests on two conclusions: (1) Vermont mortgagors are precluded from challenging matters concluded in the *Hoffman* judgment; and (2) because of the nature of its claims, the State is precluded from bringing them if the Vermont mortgagors are precluded from challenging matters concluded in the *Hoffman* judgment. Both the State and defendants concur that we must find that both conclusions are correct to affirm.[9] The State argues that both conclusions are in error, but it need prevail on only one of its

---

[8] Following the superior court decision, the State filed a motion to alter, arguing that only some of the claims were based on the court's parens patriae power, and others asserted statutory violations for which the State has independent enforcement power. Without discussion, the superior court denied the motion.

[9] Specifically, defendants have not argued the State is precluded from exercising its statutory or parens patriae power to bring this action if the Alabama judgment is not preclusive with respect to the Vermont mortgagors.

challenges. We agree with the State's argument that the superior court's first conclusion is in error; we do not reach its argument that the second conclusion is also erroneous.

¶ 17.  Before we address the State's argument, we note the standard of review at this posture of the case. On review of a grant of summary judgment, this Court applies the same standard as applied by the trial court: summary judgment will be granted only if there exists no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Bixler v. Bullard*, 172 Vt. 53, 57, 769 A.2d 690, 694 (2001). In this instance, neither the State nor defendants argue that there is a dispute over an issue of material fact; both view the case as raising essentially legal issues.

¶ 18.  Turning to the merits of the superior court's first conclusion, we start with the superior court's basic rationale: that Article IV of the United States Constitution requires that we give full faith and credit to the Alabama judgment in *Hoffman* as the judgment of a court of a sister state. The State attacks this reasoning, relying on equally settled law that a "constitutionally infirm judgment" from another state is not entitled to full faith and credit, *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 482 (1982), and that we should not find that either issue or claim preclusion blocks this cause of action. See 3 H. Newberg & A. Conte, Class Actions § 16.25 (3d ed. 1992); *Poston v. Poston*, 160 Vt. 1, 5, 624 A.2d 853, 855-56 (1993).

¶ 19.  The State alleges that the *Hoffman* judgment is constitutionally infirm with respect to the Vermont class members because the Alabama court had no personal jurisdiction over them. It advances three reasons why the Alabama court lacked personal jurisdiction: (1) where a class action can impose monetary burdens on plaintiff class members that can exceed any benefits, a state court has personal jurisdiction only over those class members who have minimum contacts with the state under *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), and such contacts did not exist between Vermont plaintiffs and Alabama; (2) even if a state court can obtain jurisdiction over class members without minimum contacts with the state, it must offer them the opportunity to opt out of the class based on fair notice of the potential burdens of the litigation, and such notice was not given here; and (3) a state can obtain personal jurisdiction over absent class members only if the class representative adequately represents them, and adequate representation was not present here. We agree with each of these reasons.

¶ 20.  To understand the State's arguments in context, we must begin with *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), a case with

some similarities to this one. All of the State's arguments are based on its reading of the decision in that case.

¶ 21. In *Shutts*, owners of land from which the defendant, an Oklahoma corporation, leased the right to extract natural gas sued in a class action in a Kansas state court to recover interest on delayed royalty payments. The plaintiff class consisted of members from all fifty states, and the average claim for each member was $100. Only 3% of the class members were from Kansas, and only .25% of the gas leases involved Kansas land. All class members were notified of the action and the right to opt out to avoid being bound by the class judgment. The defendant claimed, however, that class members could not be bound unless they satisfied the minimum contact test of *International Shoe Co. v. Washington.*

¶ 22. The United States Supreme Court noted that the *International Shoe* test was developed to determine where a defendant should be required to defend a suit. The defendant in *Shutts* argued that the same test would apply to a class action plaintiff because each absent class member risked losing "the chose in action forever through res judicata." *Shutts*, 472 U.S. at 807. The Court rejected the comparison:

> The burdens placed by a State upon an absent class-action plaintiff are not of the same order or magnitude as those it places upon an absent defendant. An out-of-state defendant summoned by a plaintiff is faced with the full powers of the forum State to render judgment *against* it. The defendant must generally hire counsel and travel to the forum to defend itself from the plaintiff's claim, or suffer a default judgment. The defendant may be forced to participate in extended and often costly discovery, and will be forced to respond in damages or to comply with some other form of remedy imposed by the court should it lose the suit. The defendant may also face liability for court costs and attorney's fees. These burdens are substantial, and the minimum contacts requirement of the Due Process Clause prevents the forum State from unfairly imposing them upon the defendant.
>
> A class-action plaintiff, however, is in quite a different posture. . . .
>
> . . . .
>
> In sharp contrast to the predicament of a defendant haled into an out-of-state forum, the plaintiffs in this suit were not

haled anywhere to defend themselves upon pain of a default judgment. As commentators have noted, from the plaintiffs' point of view a class action resembles a "quasi-administrative proceeding, conducted by the judge." . . .

. . . .

Besides this continuing solicitude for their rights, absent plaintiff class members are not subject to other burdens imposed upon defendants. They need not hire counsel or appear. They are almost never subject to counterclaims or cross-claims, or liability for fees or costs.[2] Absent plaintiff class members are not subject to coercive or punitive remedies. Nor will an adverse judgment typically bind an absent plaintiff for any damages, although a valid adverse judgment may extinguish any of the plaintiff's claims which were litigated.

> [2] Petitioner places emphasis on the fact that absent class members might be subject to discovery, counterclaims, cross-claims, or court costs. Petitioner cites no cases involving any such imposition upon plaintiffs, however. We are convinced that such burdens are rarely imposed upon plaintiff class members, and that disposition of these issues is best left to a case which presents them in a more concrete way.

Unlike a defendant in a normal civil suit, an absent class-action plaintiff is not required to do anything. He may sit back and allow the litigation to run its course, content in knowing that there are safeguards provided for his protection.

*Id.* at 808-10 (citations omitted).

¶ 23. Recognizing the difference between class action plaintiffs and defendants, the Court described a looser due process requirement to bring the former into a suit. With respect to a "claim for money damages or similar relief at law," due process requires:

The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel. The notice must be the best practicable, "reasonably calculated, under all the circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections." . . . The notice should describe the action and the plaintiffs' rights in it. Additionally,

we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court. Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members.

*Id.* at 811-12 (citations omitted).

¶ 24. The Court made clear that personal jurisdiction in such a regime was based on consent: "[t]he essential question, then, is how stringent the requirement for a showing of consent will be." *Id.* at 812; see also *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 134 F.3d 133, 141 (3d Cir. 1998) (jurisdiction under *Shutts* depends upon finding that class members have "constructively or affirmatively consented to personal jurisdiction"). Consent is shown when plaintiffs are provided a request-for-exclusion form which can be returned in a reasonable period of time. *Shutts*, 472 U.S. at 814.

¶ 25. Significant for this case, the *Shutts* holding is influenced by the Court's conclusion that in many circumstances small individual claims cannot be economically viable unless they are aggregated. The Court noted that the $100 claims in *Shutts* would "have no realistic day in court if a class action were not available." *Id.* at 809. Thus, one of the reasons to allow the opt-out procedure, rather than requiring some kind of affirmative opt in, is that plaintiffs with small claims would not bring suit individually or "affirmatively request inclusion in the class if such a request were required by the Constitution." *Id.* at 813.

¶ 26. The State's first argument why *Shutts* requires a different result in this case is that the plaintiffs here could not "sit back and allow the litigation to run its course, content in knowing that there are safeguards provided for [their] protection." *Id.* at 810. Indeed, the position of many of the class plaintiffs was closer to the defendant as described in the *Shutts* opinion. See *Kamilewicz III*, 100 F.3d at 1350 (Easterbrook, J., dissenting from denial of rehearing en banc) ("In effect, though not in name, this was a defendant class, attempting (unbeknownst to its members) to fend off predatory lawyers' claims to the balances in the escrow accounts."). This is the case described in the *Shutts* opinion that presents burdens on class members "in a more concrete way," the case the Court left to another day. *Shutts*, 472 U.S. at 810 n.2.

¶ 27. The Supreme Court has not faced the case it left open in the footnote, nor has any other court squarely faced the question. Some commentators have suggested that *Shutts* should be viewed as the outer limits of what due process will allow so that consensual jurisdiction based

on opt-out notice should not be authorized where class members face personal liability rather than loss of their chose of action. See A. Miller & D. Crump, *Jurisdiction and Choice of Law in Multistate Class Actions after Phillips Petroleum Co. v. Shutts*, 96 Yale L.J. 1, 27 (1986) ("If the burdens upon class members are significant and the expected recovery for each member is small, the due process balance should tip against jurisdiction."); see also *Kamilewicz III*, 100 F.3d at 1352 (recognizing "that the class members were effectively defendants resisting financial demands by the attorneys . . . makes the jurisdictional shortcoming clear and establishes that the judgment is not entitled to full faith and credit"); *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. 710, 796 (Bankr. E. & S.D.N.Y. 1991) ("absent plaintiffs are not affirmatively required to act in any way in order to protect their rights and will not have to pay money damages if an adverse judgment is entered against the class"), *modified*, 993 F.2d 7 (2d Cir. 1993); D. Wood, *Adjudicatory Jurisdiction and Class Actions*, 62 Ind. L.J. 597, 608 (1987) (Court left "strong impression" that nothing less than minimum contacts would be required for a defendant class). We agree with the State that the potential or actual liability of the Vermont class plaintiffs deprived the *Hoffman* court of personal jurisdiction over them, but we do not have to rest our decision on this ground alone.[10] The State advances two other reasons why there was no personal jurisdiction over class members: the notice was inadequate and the class representation was inadequate.

¶ 28. *Shutts* holds that due process requires that class plaintiffs receive notice plus an opportunity to be heard and a right to opt out. *Id.* at 812. The Court held that the notice "should describe the action and the plaintiffs' rights in it." *Id.* Although the Court's statement could be interpreted as aspirational, other courts have appropriately viewed these requirements as mandatory. See *Gersenson v. Pa. Life & Health Ins. Guar. Ass'n*, 729 A.2d 1191, 1196 (Pa. Super. Ct. 1999) (notice that failed "to provide an accurate discussion of projected benefits of the [settlement] plan and the policyholders' rights of recovery should they decline to

---

[10] Defendants argue that a holding here that jurisdiction was not available against the absent class members because the attorney's fees exceeded the economic benefit would prevent national class actions because attorney's fees always take something from the class members and prevent a 100% recovery. This argument is suggested in *Kamilewicz II*, 92 F.3d at 512. We find it wholly unpersuasive. It is one thing to have a class member's recovery reduced to pay attorney's fees; it is quite another to require the class member to pay fees that exceed the recovery. Indeed, the Court drew exactly that distinction in *Shutts*, holding that the loss of the chose in action through the preclusive effect of the class judgment was not sufficient to require minimum contacts to obtain jurisdiction over the class plaintiffs. See *Shutts*, 472 U.S. at 807-08.

participate" denies due process under *Shutts*); *San Juan 1990-A, L.P. v. Meridian Oil Inc.*, 951 S.W.2d 159, 165 (Tex. App. Ct. 1997) (per curiam) (a "fully descriptive notice apprising interested persons of the settlement" satisfies due process under *Shutts*); see also Miller & Crump, *supra*, at 36 (court in home state of absent class members can refuse to give preclusive effect to class action judgment because of "inadequately explained class plaintiffs' rights"). We can think of no better example than this case of why the notice must contain a description of plaintiffs' rights.

¶ 29. Like *Shutts*, this case involved relatively small amounts of money, but it shows that "negative value" claim cases are a double-edged sword. It would defeat the whole purpose of a class action if absent plaintiffs have to obtain professional advice to decide whether to opt out of a small claim case. Indeed, an hour of a lawyer's time would probably cost more than any economic benefit from this action for a class member.[11] Moreover, so little money is involved for each class member that it would never be economical for a class member outside of Alabama to appear and contest the fairness of the settlement. From the class member's perspective, this kind of action can work only if the class member can "sit back and allow the litigation to take its course."[12]

¶ 30. Under these circumstances, the quality of the notice was critical to any determination that class members truly consented to jurisdiction or that jurisdiction was fair under the circumstances, and it is impossible to find that the quality of the notice provided in this case met any acceptable minimum. See *Kamilewicz III*, 100 F.3d at 1350 (the substantial jurisdictional problems "were aggravated by the class members' ignorance of their exposure"). The wording of the notice can be charitably described as impenetrable, although it seemed clear that each class member would receive some small benefit, if only in the nominal interest award. See Koniak & Cohen, *supra*, at 1058-59. Indeed, the economic value, if any, could be calculated only when the "customary annual analysis" was performed for a mortgagor by the defendant bank, see

---

[11] The National Consumer Law Center treatise on consumer class actions contains a section on how attorneys can advise class members about a settlement. Among its recommendations are that the attorney read the settlement notice "carefully" and that the attorney interview the class member "with care." S. Rossman & D. Edelman, Consumer Class Actions § 12.8.4 (Nat'l Consumer Law Center 5th ed. 2002).

[12] This point has been overlooked by some of the commentators. For example, one writer argued that the class members' remedy was "to respond to the class notice, participate in the Alabama proceedings, litigate the issue, and perhaps appeal." J. Ferrini & M. Grimm, *In the Wake of Kamilewicz: A Claim of Predatory Class Counsel Fees*, 64 Def. Couns. J. 581, 582 (1997).

*supra*, note 2, and presumably a mortgagor's situation could be different then from what it was when the notice was sent.

¶ 31. The critical language, however, deals with the claim for attorney's fees. The notice clearly specifies that the fee would come from the class member's escrow account. It also says, however, that the request will be "a percentage not to exceed one-third of the economic benefit conferred." A fair reading of the notice is that each class member's recovery, already quite small, would be reduced by up to a third to pay the attorney's fees. As Judge Easterbrook stated in *Kamilewicz III*, "[t]he notice not only didn't alert the absent class members to the impending loss but also pulled the wool over the state judge's eyes." 100 F.3d at 1352; see also Koniak & Cohen, *supra*, at 1074 n.65 (stating that notice was constitutionally deficient because "it did not provide enough information for a rational actor to be able to determine whether it was in his economic interest to remain in this suit ... [and] misled class members with its faulty description of how attorney's fees would be calculated").

¶ 32. In contrast, the National Association of Consumer Advocates' Standards and Guidelines for Litigating and Settling Class Actions provide for instructive notice.[13] Under the standards, the notice of the settlement to class members should include:

- The total amount of relief to be granted the class, stated in dollars where the payment is in cash or credit to an account.

- The individual relief to be received by each member of the class, broken down into sub-classes if necessary. Where this cannot be determined in advance of the claims process, there should be a good faith estimate of the range of individual recoveries for class members.

- The total maximum fees, in dollars, to be sought by the class attorneys, and the method whereby they were calculated (hourly, hourly with a multiplier, percentage, or a combination), as well as the source from which payment will be sought.

---

[13] The Association notes that this has not always been the case:

> Consequently, the notices given to the class, whether individually or by publication, are not uniform and often are in such fine print and sufficiently complicated and unclear that the class members do not understand the nature of the relief sought or obtained in their names. They therefore do not actually have the information necessary to make an informed decision as to whether to remain members of the class, to opt out, or to object to the settlement.

National Ass'n of Consumer Advocates' Standards and Guidelines for Litigating and Settling Consumer Class Actions, 176 F.R.D. 375, 399 (1997).

*Id.* at 400; see also S. Rossman & D. Edelman, Consumer Class Actions § 10.3.1, at 139-40 (Nat'l Consumer Law Center 5th ed. 2002) ("Care should be taken to describe the proposed settlement adequately, including the best available information concerning fees and expenses that may be deducted from the gross amount. The notice should also contain an estimated range of recovery . . . that members of the class may expect to receive if the settlement is approved."); *General Motors Corp. v. Bloyed,* 916 S.W.2d 949, 958 (Tex. 1996) (settlement notice must include potential size of fee award so that class members can determine whether the settlement of their rights was influenced by class counsels' fees).

¶ 33.  We recognize that unlike *Shutts,* this was a settlement class action, and that the State's attack is on the adequacy of the notice with respect to the settlement rather than with respect to the underlying action. In the parlance of the class action rule, this case deals with the notice provided by Rule 23(e), rather than 23(c)(2).[14] By the time that class members received notice, however, the action was wholly defined by the settlement, and the underlying action became largely irrelevant. If we are to hold that the notice was sufficient to confer jurisdiction by consent, class members had to be able to evaluate what they were consenting to. See *Gersenson,* 729 A.2d at 1197 (California settlement class action notice provided material false information to Pennsylvania class members, denied due process under *Shutts,* and did not bind the class members to the California judgment); see also American Bar Association, Model Rules of Professional Conduct Rule 1.5(c) (contingent fee agreement must be in writing and "state the method by which the fee is to be determined").

¶ 34.  We also recognize that the exact method of determining attorney's fees was yet undetermined when the notice was sent, and that the notice did specify that the fees would come from the escrow account of each class member. Nevertheless, the notice purported to define "economic benefit," the lynchpin of the attorney's fees calculation, but did not actually do so. The notice could have specified the total fee sought; the estimated range of class member recovery, net of fees; or the definition of "economic benefit" used by class counsel. Any of this information would have put class members on notice that it was possible that attorney's fees for a member would exceed the economic benefit of the settlement.

¶ 35.  While we have discussed what could have been in the notice, we emphasize the one essential fact that, in our judgment, the notice had to convey to comport with due process — that is, that some, many, or all of

---

[14] The model for class action rules is Fed. R. Civ. P. 23.  Both Alabama and Vermont have adopted class action rules that, in all relevant ways, are identical to the federal rule.  See Ala. R. Civ. P. 23; V.R.C.P. 23.

the absent class members were actually in a defendant class because their attorney's fee exposure, under the fee requested by class counsel, exceeded their economic benefit. See *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999) (notice of settlement "must be sufficiently detailed to permit class members to determine the potential costs and benefits involved, or at least whether additional investigation into the matter would be an efficient use of their time"). Although the number of the absent class members who were in that circumstance might not be predictable because it depended on the escrow account status at the time the balance was adjusted under the settlement, it was predictable that at least some absent class members would suffer a net loss under any definition of economic benefit. Needless to say, few class members who read the notice and were told that they were actually in a defendant class, or had an undetermined risk that they might suffer a net loss by participating, would decline to use the opt-out option. See Wood, *supra*, at 609. Indeed, assuming the continuation of the class action could withstand the results of such a notice, we would seriously question the assertion of jurisdiction over negatively impacted class members who, for whatever reason, failed to opt out. See *id.* at 610.

¶ 36. The failure of the notice to convey the essential information is shown by the behavior of the class members in response to the notice. We know that many fully-informed class members should have opted out to avoid liability for attorney's fees that exceeded the economic benefit from the interest payment and the release of funds from the escrow account, and others should have opted out simply because they faced a risk that attorney's fees would exceed economic benefit. In fact, 1,500 class members did opt out, and the Alabama court addressed these requests for exclusion in its decision approving the settlement:

> Class counsel attempted in good faith to contact several of these people to determine the nature of the Request for Exclusion. Most of the persons contacted who requested exclusion did not wish to participate in any type of class action litigation or did not feel that BancBoston had handled their individual account improperly.

Order of Settlement Approval and Final Judgment, *Hoffman v. BancBoston Mortgage Corp.*, No. CV-91-1880, slip op. at 4 (Ala. Cir. Ct. Jan. 24, 1994). Moreover, the notice said that "[i]f you have any questions, please contact counsel for the class" and listed their names and telephone numbers. One of the class counsel testified at the fairness hearing that they received thousands of phone calls from class members, and some

questions were about the calculation of attorney's fees. According to his testimony, class counsel "told each class member that we would seek a fee equal to one-third of their economic benefit" and after the explanation, "we did not have anyone that thought that was unreasonable." While the language usage is imprecise, we interpret the testimony as stating that each class member was told that the class member could lose up to a third of the recovery to the lawyers, and not that the economic value calculation would be based on the average percentage of escrow funds released so that a third of that amount could actually exceed the money released for that mortgagor. Thus, the testimony was that the explanation was inaccurate and misleading, which explained why no class member "thought that was unreasonable." Perhaps the advice given to confused class members explains why no mortgagor reported opting out because of fear of liability in excess of the economic benefit.

¶ 37. The State's third argument why there was no personal jurisdiction over Vermont class members also is based on *Shutts*. In summarizing the requirements of due process that would allow jurisdiction over absent class members without minimum contacts with the host state, the Court concluded: "Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members." *Shutts*, 472 U.S. at 812. This requirement comes from the leading case of *Hansberry v. Lee*, 311 U.S. 32, 42-43, 45 (1940), and was reiterated most recently in *Ortiz v. Fireboard Corp.*, 527 U.S. 815, 848 n.24 (1999). It is often labeled the most important of due process requirements. See *Linder v. Litton Sys., Inc.*, 81 F.R.D. 14, 19 (D. Md. 1978); *Werlinger v. Champion Healthcare Corp.*, 598 N.W.2d 820, 827 (N.D. 1999) (adequacy of representation is of "critical importance").

¶ 38. There are two relevant aspects of representational adequacy applicable to this case. The first is that the class representatives must "fairly and adequately protect the interests of the class," including "protect the interests of the class against the possibly competing interests of the attorneys" and monitor any conflict of interest of class counsel, "for example, counsel's greater concern for receiving a fee than for pursuing the class claims." *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995) (internal quotation marks omitted); see also 7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1766, at 310-11 (2d ed. 1986) (adequacy requirement is intended to prevent situations where named plaintiffs simply lend their names to a suit controlled wholly by class counsel). We know little about the class representatives in *Hoffman*, other than that, as husband and wife, they

had a mortgage with defendants and would, as a result of the settlement, obtain the release of about $105 of escrow money. We also know, however that, as part of the settlement, they would receive an incentive payment of $2,500 each.

¶ 39.  Incentive payments to class representatives are common in class actions, and, if reasonable in amount, are proper compensation for the responsibility incurred. See *State ex rel. Byrd v. Chadwick*, 956 S.W.2d 369, 387 n.10 (Mo. Ct. App. 1997) (citing cases where class representatives received incentive awards ranging from $1,000 to $55,000). In this case, however, the effect of the incentive payments was perverse. Since the incentive payments provided an economic benefit to the class representatives far greater than the fruits of the settlement, their economic interest required them to support the settlement irrespective of how it treated any class member. Thus, they no longer protected the interests of the class, and particularly, they no longer protected the interest of the class against the attorneys for the class. See *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998) (basic due process requires that class representatives "possess undivided loyalties to absent class members"). Indeed, they were aligned with the attorneys for the class against the class. We cannot conclude that they provided adequate representation consistent with due process.

¶ 40.  The second aspect of adequacy involves the attorneys for the class. See *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) ("adequacy heading also factors in competency and conflicts of class counsel"); *Linney v. Cellular Alas. P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998); *Aide v. Chrysler Fin. Corp.*, 699 N.E.2d 1177, 1180 (Ind. Ct. App. 1998); *Glassell v. Ellis*, 956 S.W.2d 676, 684 (Tex. Ct. App. 1997) (adequate representation requirement includes both the class representatives and class counsel); see also S. Issacharoff, *Governance and Legitimacy in the Law of Class Actions*, 1999 Sup. Ct. Rev. 337, 354 (class actions are lawyer actions; adequacy of representation must focus on the incentives for faithful representation by class counsel). An attorney for the class must be loyal to each member of it, and not act based on interests antagonistic to it. See *Glassell*, 956 S.W.2d at 685 ("[c]lass counsel must serve the interests of the *entire* class").

¶ 41.  Having set forth that standard, however, we recognize that especially with respect to attorney's fees, attorneys for the class in a damages action often have an unavoidable conflict of interest with the class that does not make their representation inadequate per se. See H. Downs, *Federal Class Actions: Diminished Protection for the Class and the Case for Reform*, 73 Neb. L. Rev. 646, 685-86 (1994). *Hoffman*

epitomizes this conflict. Every dollar obtained by the class attorneys for their fees came from the accounts of the class members, making them adversaries with respect to this part of the court order. Indeed, the assumption that class counsel was bargaining "unhindered by any considerations tugging against the interests of the parties ostensibly represented in the negotiation" is suspect "probably in any class action settlement with the potential for gigantic fees." *Ortiz*, 527 U.S. at 852. This conflict of interest, and methods to control and regulate it, have dominated commentary on class actions in recent years. See *Bloyed*, 916 S.W.2d at 953, 957; R. Posner, *An Economic Analysis of Law* 570 (4th ed. 1992); Koniak & Cohen, *supra*, at 1151-53; A. Klement, *Who Should Guard the Guardians? A New Approach for Monitoring Class Action Lawyers*, 21 Rev. Litig. 25, 26-28 (2002); Note, *Class Action Settlement Collusion: Let's Not Sue Class Counsel Yet*, 22 Am. J. Trial Advoc. 605, 607-09 (1999); Note, *Peering into a Black Box: Discovery and Adequate Attorney Representation for Class Action Settlements*, 77 Tex. L. Rev. 1271, 1295-99 (1999).

¶ 42. The inherent and unavoidable conflict of interest between the class and the attorneys who represent it was exacerbated by three additional factors in *Hoffman*. The first, and most glaring, is that the class attorneys defined the economic benefit of the settlement for class members as equivalent to the amount of money released from escrow plus interest on the excessive escrow amounts held. As the State emphasizes, the escrow money belonged to plaintiffs, not defendants, and would be returned to them if not used for the various expenses, like insurance and taxes, that brought about the escrow arrangement in the first instance. Thus, the economic loss compensated for by the settlement was the loss of the *use* of the excess escrow money, not the loss of the money itself.

¶ 43. Class attorneys made expansive claims about the economic benefits of the settlement, and the Alabama court accepted them. Thus, based on testimony of a local CPA, the court found that if a mortgagor received $100 in released escrow money from the settlement and applied it to pay down the principal of the mortgage, the benefit would be $545 in reduced principal at the end of twenty years, the average period remaining on a mortgage. It found that the primary benefits of the settlement were the release of the excess escrow money, the payment of interest on the excess escrow amounts, and the injunction against requiring excess escrow money in the future.[15]

---

[15] The court also found other "less easily quantifiable economic and non-economic benefits," such as the reduction in the lien on the mortgagor's property because funds held in escrow are security for the underlying debt and the monitoring of compliance for a three-year period by

¶ 44. In return for this economic benefit, class attorneys received 28% of the excess escrow amounts held by defendants. It is debatable whether the economic benefit for any class member actually exceeded the amount of fee paid to the class attorney on behalf of that member. In any event, the State argues that the economic benefit of the settlement for Vermont mortgagors was nonexistent because Vermont statute, 8 V.S.A. § 1260, required defendants to pay interest on funds held in escrow. Thus, the State argues that the Vermont mortgagors were already compensated for the use of the money and the settlement provided them no economic benefit other than the small extra interest payment.[16]

¶ 45. Putting aside the high fees in relation to the actual economic benefit, the attorneys' advocacy for those fees was deceptive. The attorneys invited the court to look at the future economic benefit of a particular investment decision, rather than the present benefit. It was as if the court would value the money needed to buy a winning lottery ticket at the amount of the lottery proceeds. In its fairness decision, the Alabama court explicitly looked at the released escrow proceeds in that light.

¶ 46. The second factor that exacerbated the conflict of interest was the method by which the attorney's fees were actually deducted from the class members' escrow accounts. The Alabama court ruled that a fair fee would be 28% of the settlement proceeds, but, in accordance with the class attorneys' proposal, did not require class members to pay 28% of their released escrow amount and recovered interest. Although the issue was not addressed directly in the fairness hearing, we assume that a calculation of benefit for each mortgagor was deemed too complicated and expensive. Thus, as a matter of administrative convenience, the actual attorney's fee recovery was based on an average benefit as derived from a sampling done by defendants. Counsel calculated that *on average* the settlement would require defendants to release 19% of the money in the escrow accounts, and the court ordered defendants to pay to class counsel from each escrow account about 5.3% (28% x 19%) of the funds in it.

¶ 47. As the *Kamilewicz* litigation makes clear, the effect of the method of paying the attorney's fees was that, even on the inflated definition of economic benefit proffered by class counsel, the ratio of

---

plaintiffs' economic expert. These secondary benefits either double count the primary benefits or separately identify consequences of the primary benefits.

[16] In its complaint, the State claims that defendants violated the mortgage escrow statute, 8 V.S.A. § 1260, by withdrawing the attorney's fees from the Vermont mortgagors' escrow accounts. Defendants have addressed this claim, but not the State's economic benefit argument.

attorney's fees to economic benefit varied from mortgagor to mortgagor, to the point that for some class members the attorney's fees were greater than even the inflated claim of economic benefit. See Issacharoff, *supra*, at 387 (duty of faithful representation by an attorney for the class may fail "most clearly when the attorney is compensated in some fashion independently of the recovery of the class"). In effect, these class members lost the case and became debtors of the class attorneys. Indeed, the availability of the escrow funds, and the fact that defendants had to adjust them already as part of the relief, gave class counsel a device to collect the fees from thousands of class members with no administrative difficulties and little risk of nonpayment. Class members learned about their payment responsibility only after the fees were deducted from their escrow accounts.

¶ 48. We stress that class counsel had duties of loyalty to each class member. They could not claim that it was acceptable to deny recovery for one class member in order to provide a greater recovery for another — that is, to allocate benefits and burdens among the class members to ensure that they had an easy and efficient way to collect their fees. To the extent an allocation choice was present, it called for separate representation for each identifiable subclass. See *Amchem Prod., Inc.*, 521 U.S. at 626-27.

¶ 49. The third factor, while less important, helps explain how the fee provision came about. Because the settlement provided that attorney's fees would come from plaintiffs and not as a separate item of damages paid by defendants, defendants had no direct economic interest in how the fees would be calculated. Nevertheless, class counsel insisted that defendants agree that they would not oppose the attorney's fees request, and in accordance with this agreement defendants remained mute at the fairness hearing.

¶ 50. Defendants' agreement represented a form of "clear sailing" clause.[17] Its effect is described by Judge Newman in *Malchman v. Davis*, 761 F.2d 893, 907-08 (2d Cir. 1985) (Newman, J., concurring):

> A "clear sailing" clause has two adverse effects that cast substantial doubt on the legitimacy of its use. First, it deprives the trial court and a reviewing court of the certainty of having the propriety of the fee request tested in the adversary process. . . . Second, the clause creates the likelihood that

---

[17] The term is normally used to describe an agreement under which a defendant that will pay the attorney's fees directly agrees not to contest a fee award within a specified maximum amount. The agreement not to contest the fee here causes the same concerns.

plaintiffs' counsel, in obtaining the defendant's agreement not to challenge a fee request within a stated ceiling, will bargain away something of value to the plaintiff class. It is unlikely that a defendant will gratuitously accede to the plaintiffs' request for a "clear sailing" clause without obtaining something in return. That something will normally be at the expense of the plaintiff class.

(citations omitted); see also *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991) (finding that defendant's "agreement not to contest fees up to a stated maximum exacerbated the potential conflict of interest between the plaintiff class and class counsel").

¶ 51. We recognize that defendants may not have raised questions about the fee request because they wanted the settlement to be accepted. On the other hand the settlement was not conditioned on any specific attorney's fee award. Because, uniquely, defendants were concerned about their economic exposure, they had to be aware that class counsel had inflated economic value to justify their fee request. As the State points out, defendants' earlier position in opposition to class certification showed that they understood that the relief plaintiffs sought would have a differential benefit for class members so that a fee calculated on average economic benefit would have an unequal burden on class members. In short, defendants bargained away their ability to point out to the court why class counsels' request was unreasonable and to avoid this litigation.

¶ 52. In conclusion, we can think of no more compelling example of inadequate representation, by both the class representatives and class counsel, than that present here. The representatives had no incentive to protect the interests of the class and failed to do so. The normal conflict of interest of class counsel with respect to fees was allowed to take away most or all of the economic benefit of the litigation for class members and to turn the escrow accounts into a device for collecting fees from class members that in many cases exceeded any benefit from the litigation. We hold that the representation provided Vermont class members in *Hoffman* was constitutionally inadequate.

¶ 53. We recognize that there is a disagreement in the post-*Shutts* decisions whether adequacy of representation can be raised by collateral attack. See 3 H. Newberg & A. Conte, *supra*, §§ 16.23, 16.25, at 16-126, 16-137, 16-144 (adequacy of representation can be raised in a collateral attack); *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 258-59 (2d Cir. 2001) (adequacy of representation can be raised by collateral attack); *Epstein v. MCA, Inc.*, 179 F.3d 641, 648 (9th Cir. 1999) (O'Scannlain, J., with

concurrence on another ground and dissent) (adequacy of representation may not be raised by collateral attack if fair procedures exist in the forum state for determining adequacy); *In re "Agent Orange" Prod. Liab. Litig.*, 996 F.2d 1425, 1435 (2d Cir. 1993) ("[A] class action binds absent members only so long as they were adequately represented therein."); *In re Real Estate Title & Settlement Servs. Antitrust Litig.*, 869 F.2d 760, 767, 769 (3d Cir. 1989) (collateral attack based on inadequate representation authorized by *Shutts* and *Hansberry*); *MCA, Inc. v. Matsushita Elec. Indus. Co.*, 785 A.2d 625, 635 (Del. 2001) (unless elements of due process are not followed, absent class members will be bound by the judgment; elements include adequate representation); *Aide*, 699 N.E.2d at 1180 (class judgment not entitled to full faith and credit unless requirements of due process, including adequate representation, are met); *Fine v. Am. Online, Inc.*, 743 N.E.2d 416, 422-23 (Ohio Ct. App. 2000) (collateral attack based on asserted inadequacy of representation limited to whether host forum had a requirement that representation be adequate and determined adequacy under that requirement); *Taylor v. Shiley Inc.*, 714 A.2d 1064, 1067 (Pa. Super. Ct. 1998) (class member who participated in fairness hearing through counsel cannot collaterally attack class action judgment based on inadequacy of the class representation); see also Restatement (Second) of Judgments § 42(1)(d) (1982) (a person is not bound by judgment for class purporting to represent him where "there was such a substantial divergence of interest between him and the members of the class, or a group within the class, that he could not fairly represent them with respect to the matters as to which the judgment is subsequently invoked"); W. Allen, *Finality of Judgments in Class Actions: A Comment on Epstein v. MCA, Inc.*, 73 N.Y.U. L. Rev. 1149, 1163-64 (1998) (if original court has found representation adequate under fair procedures, adequacy of representation should not be subject to collateral attack in another jurisdiction); P. Woolley, *The Availability of Collateral Attack for Inadequate Representation in Class Suits*, 79 Tex. L. Rev. 383, 388 (2000) (absent class members have due process right to collaterally attack class action judgment for inadequate representation).

¶ 54. If we had to decide this case squarely on this issue, we would be inclined to follow the recent decision of the Second Circuit Court of Appeals in *Stephenson* because adequacy of representation is "the quintessence of due process in class actions." 1 H. Newberg & A. Conte, *supra*, § 4.46, at 4-185. We need not enter the heart of that debate. Even the courts and commentators who would restrict the availability of collateral attack recognize that it is permissible in some circumstances. For example, the Ninth Circuit Court of Appeals, generally a court that

restricts collateral attack on class judgments, has recognized that collateral attack based on inadequate representation is permissible if "the opposing party was on notice of facts making that failure apparent." *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 390-91 (9th Cir. 1992) (internal quotation marks omitted). Further, *Shutts* requires that representation be adequate at "all times," and class members must have some remedy if inadequacy develops after they have remained in the class in reliance on the actions of the court and class counsel. See M. Kahan & L. Silberman, *The Inadequate Search for "Adequacy" in Class Actions: A Critique of Epstein v. MCA, Inc.*, 73 N.Y.U. L. Rev. 765, 782 (1998).

¶ 55. Here, we believe that defendants were on notice of the facts that made representation inadequate. They negotiated the settlement that gave the class representatives the separate payments that eliminated any incentive to protect the interests of the class. They were aware that the fees requested would come unequally from members of the class so that some would suffer a net loss. They had to be aware that the class attorneys' definition of economic benefit was dubious at best. We do not think they can justify their inaction based on a contractual commitment to not oppose the fees requested by class counsel. If anything, that commitment deprived the Alabama court of an important source of information to judge the fairness of the fees and led to the inadequate representation. Under any reasonable preclusion rule, class members can collaterally attack the class judgment in *Hoffman* based on inadequacy of representation.

¶ 56. Finally, we emphasize that the three reasons why the Alabama judgment does not have preclusive effect, as advanced by the State and accepted by this Court, are independent, but related. That is, any of the three reasons would cause us to rule that this action can go forward, but the three reinforce each other. Thus, the risks of injustice caused by the fact that plaintiff class members were effectively defendants, or could be so, were compounded by notice that did not provide the essential information and by inadequate representation.

¶ 57. Although we have impliedly rejected it, we deal directly with defendants' argument that because the Alabama circuit court operated under fair procedures and already considered and ruled upon the alleged deficiencies raised by the State, its judgment must be considered preclusive. We hold that under *Shutts*, for the reasons discussed above — that is, the inadequate representation, the constitutionally inadequate and misleading notice, and the liability of class members — the Alabama circuit court did not have jurisdiction over the absent class members even if it operated under fair procedures and fully considered those reasons. In

the absence of jurisdiction, the State can collaterally attack aspects of the judgment.

¶ 58. Even if defendants' argument were available legally, we doubt that it is available factually. The Alabama court issued two relevant decisions in *Hoffman*. The first was issued on December 6, 1993, and tentatively approved the settlement and directed the sending of the notice. We do not have a transcript of the hearing that resulted in the order, but we know it was not adversarial. The decision reflects that the judge approved the documents presented to him. The decision does not address the court's jurisdiction over absent class members or the adequacy of class representation, but says about the notice to class members:

> The proposed Notice to be sent to the plaintiffs and class members, a copy of which is attached to the Joint Motion and Stipulation, and the procedures set forth therein, satisfy the requirements of Rule 23 of the Alabama Rules of Civil Procedure and due process and are hereby approved.

Order Conditionally Approving Settlement Class and Tentatively Approving Consent Decree, *Hoffman v. BancBoston Mortgage Corp.*, No. CV-91-1880, slip op. at 3 (Ala. Cir. Ct. Dec. 6, 1993).

¶ 59. The second decision was issued on January 24, 1994, following the fairness hearing which ended on January 11 and in which class counsel presented their fee proposal with supporting evidence. The only opponent was an attorney from the Florida Attorney General's office, who specifically opposed the fee request. He made no objection to the notice provisions, nor did he contest the adequacy of representation of class counsel or the class representative.[18] As noted above, defendants agreed in the settlement not to oppose the attorney's fees request, and they honored this commitment.

¶ 60. Without any analysis or specificity, the decision reiterated that the notice "complied with all requirements of due process, all requirements of Rule 23 of the Alabama Rules of Civil Procedure" and stated that "[d]ue and adequate notice of the proceedings has been given to members of the class." Although the decision does not directly address

---

[18] It is difficult on this record to know exactly what the Florida Attorney General did argue. We have only the transcript of the fairness hearing and the decision of the Alabama court that states that the Florida Attorney General argued that counsel fees should be paid directly by defendant, should not come from class members' escrow accounts and should follow the procedure in two other cases. One article indicates that he filed a brief and argued the points argued here, but we do not have the benefit of the brief. See Ferrini & Grimm, *supra*, at 585.

the adequacy of class counsel's representation, it makes the following statements that might be said to bear on adequacy:

> It is this Court's further opinion that the attorneys representing the Class enjoy an excellent reputation, and have considerable expertise in consumer fraud class action cases and cases involving excessive escrow deposit requirements in particular. They have prosecuted this case without any compensation whatsoever and have represented the Class on a contingency fee basis.
>
> . . . .
>
> In this case, because of the broad responsibilities and risks assumed by class counsel, and the unprecedented results achieved by Class counsel, Class counsel's efforts merit a fee based on a percentage of the economic benefit conferred by this settlement.

Order of Settlement Approval and Final Judgment, *Hoffman v. BancBoston Mortgage Corp.*, No. CV-91-1880, slip op. at 11, 13 (Ala. Cir. Ct. Jan. 24, 1994).

¶ 61. We do not accept that the Alabama court litigated the issues on which jurisdiction over the class members depended. Indeed, the essential deficiency in the fairness proceeding is that the court did not litigate them. No one raised the effect of the incentive payments on the class representatives' duty of loyalty to the class. The limited evidence at the fairness hearing brought out obliquely that all the class members might not come out ahead, but class counsel was unable at that time to describe the impact on any class member because the amount of money in the escrow accounts fluctuated widely from month to month and the actual calculation would occur in the future. There was no contest over the class notice, and the court simply accepted it as proposed jointly by class counsel and defendants without analysis.

¶ 62. Although there was a contest over the amount of the fees, it never addressed the differential impact because that impact could not be predicted when the fairness hearing occurred. The Florida Attorney General did not claim that class counsel's representation was inadequate, and the court made no finding of adequacy.

¶ 63. We recognize that the Alabama court attempted to revisit the issues on which personal jurisdiction over the absent class members was based after the *Kamilewicz* litigation was filed, but the plaintiffs in *Kamilewicz* never appeared in Alabama. As a result, that proceeding was

ex parte, and the resulting decision was overturned by the Alabama Supreme Court. That proceeding has no preclusive effect.

¶ 64. Even if we accepted that the Alabama proceeding could address the due process issue to give it preclusive effect, we do not agree that it did so. The court never confronted the fact that some members of the plaintiff class would suffer a net liability because of the litigation, that the notice did not allow any class member to determine whether the settlement would be a benefit, and that the representation was inadequate for those for whom the litigation was not a benefit.

¶ 65. Finally, we decline defendants' request that we enforce the *Hoffman* judgment and preclude this litigation as a matter of comity. While we have frequently enforced foreign judgments as a matter of comity, we will not do so if such enforcement would offend a significant policy of this state. See, e.g., *Pioneer Credit Corp. v. Carden*, 127 Vt. 229, 235, 245 A.2d 891, 895 (1968) (this Court will not enforce penalties imposed by another state).

¶ 66. The *Hoffman* case is an example of what the former Chief Justice of the Alabama Supreme Court has characterized as a "drive-by" class action. See *Mitchell v. H & R Block, Inc.*, 783 So. 2d 812, 818 (Ala. 2000) (Hooper, C.J., dissenting) (decision shows that Alabama court is "intent upon remaining the poster child for . . . abuse of the judicial system [by] 'drive-by' class certification"); see also L. Mullenix, *Abandoning the Federal Class Action Ship: Is There Smoother Sailing for Class Actions in Gulf Waters?*, 74 Tul. L. Rev. 1709, 1715 (2000) (prevailing sense among some practitioners is that in Gulf states "judges are more than willing to certify almost anything that walks through the courtroom doors"). For whatever reason, Alabama has been a magnet forum for national class actions, even when Alabama has no connection with the vast majority of the plaintiffs or with the defendants. Class counsel could have filed *Hoffman* in virtually any state where they could find a willing plaintiff and affirmatively chose Alabama. That choice may have more to say about how the forum treats class counsel than how it treats the interests of class members. See Kahan & Silberman, *supra*, at 775.

¶ 67. We are not unmindful of the benefits that national class actions can bring to our citizens, without an accompanying burden on our judicial system. Where, however, the forum state exercises too little control and supervision to ensure our citizens are fairly protected and compensated for their losses, it cannot be a policy of this state to visit the resulting injustice on our citizens. *Hoffman* does not represent the kind of judgment we will enforce as a matter of comity.

¶ 68. For the foregoing reasons, we find that the *Hoffman* judgment is not binding on Vermont class members because the Alabama circuit court had no personal jurisdiction over them. Because it is not binding on Vermont class members, it is not binding on the State. Thus, it does not prevent the State from bringing any of the claims contained in its complaint. The superior court therefore erred in granting summary judgment for defendants.

*Reversed and remanded.*

