591 S.E.2d 611

HOSPITALITY MANAGEMENT ASSOCIATES,
INC., et al., Appellants,

v.

SHELL OIL COMPANY d/b/a Shell Chemical Company,
Hoechst Celanese Corporation, and E.I. Dupont de
Nemours & Company, Respondents.

No. 25764.

Supreme Court of South Carolina.

Heard Nov. 18, 2003.

Decided Jan. 12, 2004.

646

David A. Collins, of Smith & Collins, of Charleston; Fleet Freeman, of Freeman & Freeman, of Mt. Pleasant; Justin O'Toole Lucey, of Mt. Pleasant; M. Lee Robertson, Jr., of Mt. Pleasant; and Paul Dominick, of Nexsen Pruet Jacobs Pollard & Robinson, LLP, of Charleston, for appellants.

Timothy W. Bouch and G. Hamlin O'Kelley, III, of Leath Bouch & Crawford, LLP, of Charleston; and David T. Harvin and Erica L. Krennerich, of Vinson & Elkins L.L.P., of Houston, for respondent Shell Oil Company.

Jane W. Trinkley and Robert L. Widener, of McNair Law Firm, P.A., of Columbia; and Paul M. O'Connor, III, and Seth Moskowitz, of Kasowitz, Benson, Torres & Friedman LLP, of New York, for respondent Hoechst Celanese Corporation.

Henry B. Smythe, Jr., and David B. McCormack, of Buist Moore Smythe McGee P.A., of Charleston; and Kathleen Taylor Sooy, of Crowell & Moring LLP, of Washington, for respondent E.I. Dupont de Nemours & Company.

Justice WALLER:

In this direct appeal, the trial court denied appellants' request for class certification and granted summary judgment in favor of respondents. The main issue of this appeal is whether two nationwide class action settlements approved by

the Alabama and Tennessee state courts are entitled to full faith and credit, thereby precluding appellants—as absent class members who did not opt out—from proceeding with this action. Moreover, the crucial sub-issue of that question is what is the appropriate **scope of collateral review** this Court should give to the rendering courts' final decisions approving the settlements. The trial court found that: (1) a limited scope of review is proper, and (2) the due process issues were fully and fairly litigated; therefore, the trial court ruled the final settlements are entitled to full faith and credit. We affirm.

## FACTS/PROCEDURAL HISTORY

Appellants seek damages against respondents Shell Oil Company ("Shell"), Hoechst Celanese Corporation ("Celanese"), and E.I. DuPont de Nemours & Co. ("DuPont"), for defective polybutylene plumbing systems. Appellants own structures containing this type of plumbing system. Neither of the respondents manufactured these polybutylene systems, but each produced and sold a resin utilized in the manufacture of the systems.[1] The systems were marketed as an alternative to copper-based systems. Appellants allege respondents **falsely** represented that the polybutylene plumbing systems were of high quality, were reliable, and would last decades. Indeed, appellants claim respondents knew the resins would degrade and corrode when exposed to the chemicals found in ordinary drinking water (e.g., chlorine), and therefore, knew these systems would fail. According to appellants, polybutylene plumbing systems are an "unmitigated disaster" as they experience an unusually high failure rate.

On May 30, 1995, the original plaintiffs filed this lawsuit ("the Howard plaintiffs"). However, two nationwide class action settlements—*Spencer* in Alabama state court and *Cox* in Tennessee state court—were finalized in November 1995; the Howard plaintiffs opted out of these two settlements and

---

1. Shell manufactured and sold polybutylene, which is a raw material plastic, i.e., a resin, to manufacturers who extruded it into the polybutylene pipes used in these systems. Celanese and DuPont manufactured and sold Celcon and Delrin, respectively, which were molded into the plastic fittings used to join the pipes together.

subsequently settled their individual claims.[2]  Appellants successfully intervened in the instant case in 1996 and 1997.  The lawsuit was designated as a complex case, and Judge Pieper was assigned to it.  Initial discovery in the litigation was restricted to the full faith and credit issue.

Respondents moved for summary judgment arguing that appellants were members of the national class actions which had been settled and those settlements are entitled to full faith and credit.  Appellants responded that because class members were not provided with due process, the state courts did not acquire personal jurisdiction, and thus, the final orders should not be accorded full faith and credit.  Holding that further inquiry into the facts was appropriate, Judge Pieper denied respondents' motions for summary judgment in June 1998.

Shortly after the denial of summary judgment, Judge Pieper *sua sponte* recused himself after learning that a family member had requested claim information from one of respondents' representatives in the out-of-state litigation.  Thereafter, Judge Dennis was assigned to the case.

Respondents moved to have Judge Dennis reconsider or vacate Judge Pieper's order denying summary judgment.  The trial court denied this request, finding that Judge Pieper's order was "a temporary ruling which invites another Motion."

Pursuant to Rule 23, SCRCP, appellants requested certification of a class defined, in pertinent part, as follows:

An opt-in class of all South Carolina persons and entities that own structures in which there has been installed a polybutylene plumbing system, wherever located;  and non-resident persons and entities that own such structures located in the State of South Carolina.

Finding that none of Rule 23's requirements had been satisfied, Judge Dennis denied class certification.

Finally, after respondents renewed their motions for summary judgment, the trial court granted judgment in their favor.  The trial court found that the Alabama court-approved

---

**2.**  The Howard plaintiffs were three couples who each owned a home with a polybutylene plumbing system.  They received settlements for $25,000, $20,000 and $20,000.

*Spencer* settlement and the Tennessee court-approved *Cox* settlement were both entitled to full faith and credit. Significantly, the trial court found that the issue of whether absent class members were provided with minimum due process was an issue subject only to extremely limited collateral review, making the dispositive issue whether the due process issue was fully litigated in, and determined by, the Alabama and Tennessee courts. The trial court found that the due process issues relating to the exercise of personal jurisdiction over the absent class members had been fully considered by the *Cox* and *Spencer* courts, and therefore their findings of jurisdiction were entitled to full faith and credit without further review on the merits.

To resolve the issues raised in this appeal, a review of the facts surrounding the nationwide settlements is also necessary.

### The Spencer and Cox Settlements

The *Spencer* lawsuit was filed in November 1994 in Alabama state court. At that time, yet another nationwide class action case was pending in a Texas state court, *Beeman v. Shell Oil Co.*, and a settlement was actively being negotiated. Although the parties reached a settlement in *Beeman,* it ultimately fell through when the Texas court denied preliminary approval in February 1995. In May 1995, DuPont reached a settlement in *Spencer,* and the Alabama court preliminarily approved it. However, because the settlement was only with DuPont, claims against Shell and Celanese remained.

According to the original terms of the settlement with DuPont, DuPont agreed to pay 8% of: (1) the actual cash value of physical damage to tangible property caused by a leak in the plumbing system which occurred within 15 years of the installation, and (2) the cost of a replumb completed within 15 years of the installation. The fund for these costs was set at $120 million, and when that amount was paid, DuPont retained the option to provide additional funding. If it opted not to provide additional funding, class members who had not been paid would retain all rights against DuPont.

In June 1995, *Cox* was filed against Shell and Celanese in Tennessee. The same day the lawsuit was filed, the Tennessee court certified the class. Meanwhile, the *Spencer* action

was still proceeding against Shell and Celanese, and the Alabama court certified that class as well. Thus, two competing nationwide classes had been certified.[3]

Negotiations in *Cox* resulted in a settlement being reached with Shell and Celanese on July 31, 1995. The original settlement terms were that Shell and Celanese would provide $850 million to fund replumbs for those claimants who had a qualifying leak. In addition, recovery could be had for physical damage to tangible property resulting from a leak. A centralized facility, the Consumer Plumbing Recovery Center (CPRC), was to be created to administer the terms of the settlement. Like the settlement reached with DuPont in *Spencer*, the agreement tolled the statutes of limitation and repose in the event the fund was exhausted and Shell and Celanese decided not to contribute additional funding. Moreover, future owners were covered by the settlement because the agreement provided for four future notice periods.

Objections were raised to the *Cox* settlement. In October/November 1995, class counsel for both *Cox* and *Spencer* participated in a two-week mediation with California Judge Richard M. Silver,[4] and ultimately, a joint national settlement was reached. This global settlement was basically the *Cox* settlement that previously had been approved by the Tennessee court, but with several significant changes, such as the joint settlement fund was increased to $950 million; the interest on the funds was to go to the CPRC (not back to Shell and Celanese); and the window for filing claims was increased from one year to two years. In addition, the parties agreed that no objection would be made to *Spencer* class counsel requesting up to $30 million in attorneys' fees. After the global settlement was reached, the objections to *Spencer* by *Cox* class counsel and the objections to *Cox* by *Spencer* class counsel were withdrawn.

---

3. It may even be more accurate to say that **three** classes had been certified: a settlement class v. DuPont in Alabama, a trial class v. Shell and Celanese in Alabama, and a settlement class v. Shell and Celanese in Tennessee. The competition aspect, however, clearly was between the trial class against Shell and Celanese in Alabama and the settlement class against those same two companies in Tennessee.

4. Judge Silver was presiding over another class action suit, this one a statewide class action pending in California.

On November 17, 1995, the *Cox* court entered a final order approving the class action settlement against Shell and Celanese which included $45 million for class counsel and $3,000 for class representatives. The funds for notice and attorneys' fees were **in addition** to the $950 million in settlement funds. On the same day, the *Spencer* court finally approved the class action settlement against DuPont.

Also on November 17, Shell, Celanese and DuPont entered into an agreement coordinating the two settlements. DuPont agreed to pay 10% of all CPRC costs associated with claims arising from polybutylene plumbing systems with acetal insert fittings, and 10% of CPRC administrative expenses (excluding costs for *Cox* attorneys' fees or notice). These payments by DuPont were to come out of the *Spencer* settlement fund. The coordination apparently allows claimants to file a single claim with the CPRC in order to get relief from both settlements.

## ISSUES

Appellants appeal from three orders wherein the trial court granted summary judgment to respondents, denied appellants' request for class certification, and denied respondents' request to vacate or reconsider Judge Pieper's previous order denying summary judgment. However, we find the dispositive issue of this appeal is:

> Did the trial court err in granting summary judgment based on its finding that the *Spencer* and *Cox* final settlement orders are entitled to full faith and credit?

## DISCUSSION

Appellants argue that as absent parties who did not appear in the out-of-state actions, they are free to collaterally challenge the *Spencer* and *Cox* judgments based on personal jurisdiction. Appellants claim the Alabama and Tennessee courts did not have personal jurisdiction over them because they were not accorded the minimal due process required for absent class members. Specifically, appellants argue that, for several reasons: (1) notice was constitutionally insufficient; and (2) there was inadequate representation.

Respondents, on the other hand, argue the trial court correctly found that the scope of review when determining full faith and credit is limited to whether the jurisdictional issues were fully and fairly litigated in the rendering courts. Because they claim the issues related to due process were fully and fairly litigated, respondents argue the trial court correctly granted summary judgment without further inquiry into the merits of personal jurisdiction/due process.

Clearly, the **scope of review** aspect of the full faith and credit issue is the threshold question, and, given the current state of the law on this issue, it is also a thorny one.

## Scope of Collateral Review

■ The Full Faith and Credit Clause provides, in pertinent part, that "[f]ull faith and credit shall be given in each state to the ... judicial proceedings of every other state." U.S. Const. art. IV, § 1. Full faith and credit "generally requires every State to give to a judgment at least the res judicata effect which the judgment would be accorded **in the State which rendered it.**" *Durfee v. Duke,* 375 U.S. 106, 109, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963) (emphasis added).

■ The rule in a class action lawsuit is not any different. Indeed, the United States Supreme Court ("USSC") has specifically stated that "a judgment entered in a class action, like any other judgment entered in a state judicial proceeding, is presumptively entitled to full faith and credit." *Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 374, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996).

■ Nonetheless, it is also well settled that a judgment issued without proper personal jurisdiction over an absent party is not entitled to full faith and credit, and therefore has no res judicata effect as to that party. *E.g., Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 805, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *see also Kremer v. Chemical Const. Corp.,* 456 U.S. 461, 482, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) ("A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, ... and other state and federal courts are not required to accord full faith and credit to such a judgment.") (footnote omitted).

In *Shutts*, the USSC held that the Due Process Clause protects an absent class action plaintiff "even though that plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant." *Shutts*, 472 U.S. at 811, 105 S.Ct. 2965. Thus, in order to provide minimal due process, absent class plaintiffs:

> must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel. The notice must be the best practicable, "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." ... The notice should describe the action and the plaintiffs' rights in it. Additionally, ... due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court. Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members.

*Id.* at 812, 105 S.Ct. 2965 (citations omitted). If the due process requirements of (1) notice; (2) an opportunity to be heard; (3) an opportunity to "opt out;" and (4) adequate representation are met, the foreign court properly asserts personal jurisdiction over the absent class plaintiffs. Accordingly, those plaintiffs who elect not to opt out are bound by the foreign court's judgment.

The law is less settled, however, when the issue is the scope of review of a rendering court's judgment regarding due process in a class action lawsuit. According to respondents, the Court of Appeals for the Ninth Circuit's view on the law is the correct one. In *Epstein v. MCA, Inc.*, 179 F.3d 641 (9th Cir.), *cert. denied*, 528 U.S. 1004, 120 S.Ct. 497, 145 L.Ed.2d 384 (1999) ("*Epstein III* "), the Ninth Circuit held that **broad** collateral review of the due process requirements for binding absent class members is **not** available. Instead, the extent of collateral review is **limited** to a consideration of "whether the procedures in the prior litigation afforded the party against whom the earlier judgment is asserted a 'full and fair opportunity' to litigate the claim or issue." *Id.* at 648–49. The *Epstein III* court declared the following:

Simply put, the absent class members' due process right to adequate representation is protected not by collateral review, but by the certifying court initially, and thereafter by appeal within the state system and by direct review in the United States Supreme Court.... Due process requires that an absent class member's right to adequate representation be protected by the adoption of the appropriate procedures by the certifying court and by the courts that review its determinations; due process does not require collateral second-guessing of those determinations and that review.

*Id.* at 648 (citations omitted).[5]

Moreover, the procedural history of *Epstein v. MCA, Inc.* is noteworthy. The initial decision by the Ninth Circuit reversed a district court's ruling which gave full faith and credit to a class action settlement in Delaware. *See Epstein v. MCA, Inc.,* 50 F.3d 644 (9th Cir.1995) (*"Epstein I "*). The *Epstein I* court held that because the Delaware class action settlement released **exclusively federal claims,** the Delaware state court judgment was not entitled to full faith and credit. The USSC reversed and remanded. *See Matsushita Elec. Indus. Co. v. Epstein, supra.* On remand, a divided panel of the Ninth Circuit held that the Delaware judgment was **not** entitled to full faith and credit because it violated due process based on the inadequacy of the class representation. *Epstein v. MCA, Inc.,* 126 F.3d 1235 (9th Cir.1997) (*"Epstein II "*). Significantly, the *Epstein II* court rejected Matsushita's argument that the court was limited to reviewing "the **procedures** that Delaware had in place to ensure adequate representation, rather than the adequacy of the representation itself." *Id.* at 1242 (emphasis in original). Thereafter, the Ninth Circuit granted rehearing, and a reconstituted panel [6] withdrew its *Epstein II* opinion and rejected the appellants' contention that

---

**5.** While the specific challenge in *Epstein III* involved adequate representation, the *Epstein III* court made clear that its reasoning applied to all aspects of the *Shutts* due process requirements. *See Epstein III,* 179 F.3d at 649 ("*Matsushita* itself indicates that broad collateral review of the adequacy of representation **(or of the other due process requirements for binding absent class members)** is not available.") (emphasis added).

**6.** The authoring judge of both *Epstein I* and *II* had resigned in the interim.

the Delaware judgment was not entitled to full faith and credit. *Epstein III, supra.*

Thus, the final word from the Ninth Circuit in *Epstein III* was the emphatic statement that "where the certifying court makes a determination of the adequacy of representation in accord with *Shutts*," this determination is **not** subject to broad collateral review. 179 F.3d at 648.[7] The USSC declined to review *Epstein III. Epstein v. Matsushita Elec. Indus. Co.,* 528 U.S. 1004, 120 S.Ct. 497, 145 L.Ed.2d 384 (1999).

After *Epstein III* was decided, however, the Court of Appeals for the Second Circuit handed down *Stephenson v. Dow Chemical Co.,* 273 F.3d 249 (2nd Cir.2001). Appellants contend that, pursuant to *Stephenson,* a broad collateral attack on the nationwide settlements is permissible.[8]

In *Stephenson,* two Vietnam War veterans brought suit in 1998 and 1999 for injuries based on their exposure to Agent Orange during the war. But in 1984, a global class action settlement had been entered on identical claims. The settlement provided that no payments would be made for death or disability occurring after December 31, 1994. The *Stephenson* plaintiffs' conditions had not been diagnosed until 1996 and 1998.

The district court dismissed the *Stephenson* lawsuit finding it was an impermissible collateral attack on the 1984 settlement. On appeal, the plaintiffs argued they were inadequately represented, and therefore, the earlier class action settlement did not preclude their claims. The *Stephenson* court agreed thereby allowing a "broad collateral attack" on the

---

7. One judge on the panel dissented, standing by the decision in *Epstein II. Epstein III, supra* (Thomas, J., dissenting).

8. Appellants also argue that South Carolina precedent supports the proposition that the courts of this state may review the jurisdictional underpinnings of a foreign judgment before granting full faith and credit. *See, e.g., Peoples Nat'l Bank of Greenville v. Manos Bros., Inc.,* 226 S.C. 257, 275, 84 S.E.2d 857, 866 (1954) (where in determining the validity of a Georgia divorce decree, the Court stated: "It is well settled that want of jurisdiction over either the person or the subject matter is **open to inquiry** where a judgment rendered in one state is challenged in another.") (emphasis added). We note, however, that nationwide class action lawsuits clearly raise very particularized due process issues, and we therefore focus our analysis on case law in that context.

class action settlement. The *Stephenson* court specifically found that the plaintiffs' lawsuit could continue because there had been "no prior adequacy of representation determination with respect to individuals whose claims arise after the depletion of the settlement fund." *Id.* at 258. The court rejected the defendants' reliance on *Epstein III* for "a limited collateral review theory." *Id.* at n. 6. Instead, the court decided that:

> [T]he propriety of a collateral attack such as this is amply supported by precedent. In *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), the Supreme Court entertained a collateral attack on an Illinois state court class action judgment that purported to bind the plaintiffs. The Court held that class action judgments can only bind absent class members where "the interests of those not joined are of the same class as the interests of those who are, and where it is considered that the latter fairly represent the former in the prosecution of the litigation." *Id.* at 41, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22; *cf. Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 805, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) ("[I]t is true that a court adjudicating a dispute may not be able to predetermine the res judicata effect of its own judgment.").

*Id.*

As to the merits of the collateral attack, the *Stephenson* court relied on the USSC's recent decisions in *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), and *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999),[9] to find that the *Stephenson* plaintiffs had not been adequately represented in the 1984 settlement, and therefore were not bound by it.

The USSC granted certiorari to review *Stephenson.*[10] However, the USSC ultimately issued a per curiam decision which

---

9. Both these cases involved **direct appeals** of global class settlements in asbestos litigation.

10. The two questions at issue on certiorari were whether absent class members are precluded from relitigating the issue of adequacy of representation through a collateral attack on a class settlement, and, if collateral attack is permissible, whether the "adequacy of representation" issue is properly determined as of the time of the original

vacated the Second Circuit's opinion as to one set of plaintiffs, and, by an equally divided court, summarily affirmed the decision allowing collateral review as to the other set of plaintiffs. *Dow Chemical Co. v. Stephenson*, 539 U.S. 111, 123 S.Ct. 2161, 156 L.Ed.2d 106 (2003) (Stevens, J., not participating).

Thus, it remains an open, and hotly litigated, question as to whether limited collateral review is required on the *Shutts* due process requirements in a class action case (*see Epstein III* ), or whether a broader, merits-oriented collateral review is permitted (*see Stephenson* ). In addition to the conflict in the federal circuits as exemplified by *Epstein III* and *Stephenson*, there is also disagreement amongst the state courts [11] and legal scholars.[12]

---

litigation or in light of changes in the law years after the settlement has become final.

**11.** *Compare Fine v. America Online, Inc.*, 139 Ohio App.3d 133, 743 N.E.2d 416, 420 (2000), *cert. denied*, 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001) (staunchly following *Epstein III* and stating: "Modern constitutional jurisprudence requires that the absent class members' rights to due process be protected not by substantive collateral review, but, rather, by the application of appropriate procedures in the certifying court and by the courts that review its determinations.") *with State v. Homeside Lending, Inc.* 826 A.2d 997, 1016–17 (Vt.2003) (recognizing disagreement on whether collateral attack is available on adequate representation, but indicating its inclination "to follow the recent decision of the Second Circuit Court of Appeals in *Stephenson* because adequacy of representation is 'the quintessence of due process in class actions' ") (citation omitted).

**12.** *Compare, e.g.,* Marcel Kahan & Linda Silberman, *The Inadequate Search for "Adequacy" in Class Actions: A Critique of Epstein v. MCA, Inc.*, 73 N.Y.U. L.Rev. 765, 771 (1998) (critiquing the *Epstein II* decision, and advocating what became the *Epstein III* position that if the initial forum made a finding of adequate representation and employed "fair procedures" in making the finding, then "the substance of the finding itself is not subject to collateral attack.") (hereinafter "Kahan & Silberman") *with* Patrick Woolley, *The Availability of Collateral Attack for Inadequate Representation in Class Suits*, 79 Tex. L.Rev. 383, 388 (2000) ("The argument for limiting collateral attack contradicts two fundamental principles: first, a court has no jurisdiction over absent class members who have not been adequately represented; second, a judgment entered without jurisdiction may be collaterally attacked if the party bound by the judgment did not appear and had no obligation to do so.").

In our opinion, there are important policy considerations favoring both limited and broad collateral review. Certainly, in the specialized context of class action litigation, the significant interests in efficiency and finality favor limited review. If the due process issues are fully and fairly litigated and necessarily decided by the rendering court, then the strong interest in finality militates in favor of an extremely limited collateral review. Without limited review, a nationwide class action could be vulnerable to collateral actions in the 49 other states in which it was not litigated initially. It would seem to be a waste of judicial resources to require reviewing courts to conduct an extensive substantive review when one has already been undertaken in a sister state. As the Ohio court stated in *Fine v. America Online:* "To allow substantive collateral attacks would be counter intuitive to [the] procedural relief that a class-action suit is intended to afford our judicial system nationwide." 743 N.E.2d at 421–22.

On the other hand, there is the fundamental interest in not allowing constitutionally infirm judgments to be enforced. It would be troublesome to enforce a class action settlement against parties over whom the rendering court did not have personal jurisdiction. We note, however, that the view espoused in *Epstein III* envisions that direct appellate review of a class action is the appropriate vehicle to correct whatever errors may have been made at the trial court level.[13]

We hold that in a case such as this one, only a limited collateral review is appropriate. It would run counter to the class action goals of efficiency and finality to allow successive reviews of issues that were, in fact, fully and fairly litigated in the rendering court. Moreover, second-guessing the fully litigated decisions of our sister courts would violate the spirit

---

13. We also recognize there exists the concern that a particular state may abuse the class action lawsuit by improperly providing a too-friendly forum for class actions. *See* Kahan & Silberman, 73 N.Y.U. L.Rev. at 775–76 (describing the class action forum shopping problem as "sinister" and observing that "both class counsel and defendant may prefer a forum that rubberstamps any settlement they reach"); *see also State v. Homeside Lending, Inc.,* 826 A.2d at 1020 (where the Vermont Supreme Court noted that for "whatever reason, Alabama has been a magnet forum for national class actions, even when Alabama has no connection with the vast majority of the plaintiffs or with the defendants.").

of full faith and credit. *See Fine v. America Online,* 743 N.E.2d at 421.

Therefore, we concur with the Ninth Circuit's view and find due process requires that an absent class member's rights are protected by the adoption and utilization of appropriate procedures by the certifying court; thereafter, the merits of the certifying court's determinations are subject to direct appellate review. As for collateral review, however, due process does not afford any "second-guessing of those determinations." *Epstein III,* 179 F.3d at 648. Instead, what this limited review entails is "an examination of **procedural** due process and nothing more." *Fine v. America Online,* 743 N.E.2d at 421. More specifically, we must determine: (1) whether there were safeguards in place to guarantee sufficient notice and adequate representation; and (2) whether such safeguards were, in fact, applied. *Id.* at 422.

Initially, we note our agreement with the trial court's findings that both the *Spencer* court in Alabama and the *Cox* court in Tennessee actually ruled that the due process requirements had been met. Both these courts specifically found that the respective notice programs met minimal due process. The *Cox* final order stated that the adequacy requirement (in terms of Tennessee's Rule 23) had been met and it had jurisdiction over the parties. The *Spencer* final order found the "settlement fair, adequate and reasonable" to the members of the class.

Accordingly, under a limited collateral review, the two foreign judgments on their face appear to be entitled to full faith and credit. *See, e.g., Epstein III, supra; Fine v. America Online, supra.* Nonetheless, we turn separately to a review of the procedures utilized by the foreign courts to ensure proper notice and adequate representation.

### Notice

Some factual background on the notice programs is required.

As noted by the *Cox* court, the notice in *Cox* was "a singularly comprehensive and creative notice program." According to the president of one of the consulting companies hired to provide notice in *Cox,* the program was designed to

reach the largest possible number of consumers whose homes contained polybutylene plumbing. Over 5.6 million individual mailed notices were sent; of those, 244,756 were mailed to South Carolina addresses. In addition, there was a toll-free 800 telephone number set up to field questions about the settlement. More than 1 million calls were received, and over 10,000 additional notices were mailed out.

Furthermore, there was an extensive multimedia campaign. For example, between August 21, 1995 and September 3, 1995, a 30–second television spot was aired 213 times on national network and cable television; during September 1995, full page notices appeared in Parade magazine, USA Weekend, USA Today, People magazine, and TV Guide, as well as in 201 daily and weekly newspapers in 13 targeted states (of which South Carolina was one), 38 Hispanic newspapers, and 2 African–American newspapers; on October 3, 1995, a national news conference was held in Washington, DC, and a press release was sent to 2,000 newspapers, wire services, magazines and broadcast points across the United States; and a World Wide Web home page was created. Statistics as of October 30, 1995, estimated that the media campaign reached over 90% of those Americans over age 25, or exposure to over 150 million people.

Likewise, in *Spencer*, an extensive notice program occurred during August, September and October 1995. Because the DuPont product was sold "more heavily in the Mid–Atlantic and Southeast regions in site-built ('starter') homes, mobile homes, and apartments," the notice program was designed to reach people that fell within this demographic, which was determined to be middle-class, high school educated adults with household incomes of less than $45,000. Over 2.5 million notices were directly mailed to people in 12 states, of which South Carolina was one. The mailing list was generated based on mobile home ownership listings. Over 275,000 phone calls were initially received on the 800 number, and 90,000 additional notices were sent out based on individual requests.

As in *Cox*, there was a multimedia campaign in *Spencer* as well. The notice was published in USA Today, USA Weekend, TV Guide, Jet magazine, Parade magazine, and 66 Spanish-language newspapers. Television and radio commercials

were aired; press and video news releases were distributed. The notice program cost $7.4 million.

Regarding the content of the notices, the notices in both *Cox* and *Spencer* explained the terms of the settlement, provided for the opportunity to participate (e.g., by filing objections and appearing at the fairness hearing), and gave information on how to opt out.

Nonetheless, appellants contend that notice to them as absent class members was constitutionally insufficient. Appellants argue, *inter alia*, that they were entitled to personal notice, rather than by publication. In addition, they maintain that the notice programs were deficient to all class members **other than** mobile home owners and the content of the notice was incomplete.

Without question, due process requires that absent class plaintiffs be given notice. *Shutts, supra*. However, the standard for notice is that it must be "the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Shutts*, 472 U.S. at 812, 105 S.Ct. 2965 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314–15, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).

In the final order approving the class settlement, the *Cox* court made several general findings, and numerous specific findings, related to notice. The *Cox* court characterized the notice program as excellent and found it was the best notice practicable under the circumstances. The court further described the program as one unprecedented in "reach, scope, and effectiveness." Additionally, the *Cox* court used court-appointed class notice providers (two consulting companies), and considered testimony of employees of these companies. The final order extensively details the notice program, highlighting many of the aspects outlined above. The *Cox* court concluded that the notice program "met and exceeded" both minimum due process requirements and the notice requirements under Tennessee's class action rule.[14]

---

14. We note further that the *Cox* court had been kept apprised of the notice program as it progressed.

Clearly, the *Cox* court designed and utilized various procedural safeguards to guarantee sufficient notice under the circumstances. Pursuant to a limited scope of review, we need go no further in deciding the *Cox* court's findings that notice met due process are entitled to deference.

As in *Cox*, the issue of notice was fully litigated in *Spencer*. The *Spencer* court issued an order prior to the implementation of the notice program specifically approving the notice and authorizing the notice program.[15] In the final order approving the class settlement, the *Spencer* court stated that notice was sent "via first class and by means of a massive national media campaign." The court specifically found that the form of notice satisfied both due process requirements and the notice requirements under Alabama's class action rule. The *Spencer* court relied on the affidavit of the consultant who designed the notice program and related the details of the notice program, as discussed above. The court concluded that "the means of disseminating the notice was the best practicable, reasonably calculated, under all the circumstances, to apprise the interested parties of the pendency of the Action and their rights therein."

Accordingly, we hold that under a limited collateral review it is clear there were proper procedures in place to ensure notice in the *Spencer* case complied with minimum due process.

### Adequate Representation

Appellants argue full faith and credit should not be accorded to the *Spencer* and *Cox* settlements because adequate representation was lacking. More specifically, appellants argue that conflicts within the class required subclasses; class counsel had impermissible conflicts with class members; and class representatives, as mobile home owners, were inadequate representatives for other types of owners, such as those who own multi-unit structures. Pursuant to a limited review, however, we need merely to determine whether there were safeguards in place to guarantee adequate representation. We conclude that in both *Spencer* and *Cox*, there were the proper procedures present.

---

**15.** This order expressly stated that the court had heard arguments of counsel on the notice issue.

*Shutts* declared that due process "of course requires that the named plaintiff **at all times adequately represent** the interests of the absent class members." 472 U.S. at 812, 105 S.Ct. 2965 (emphasis added).

Recently, the USSC has elaborated on what constitutes adequate representation. In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), an asbestos litigation case decided **after** the *Spencer* and *Cox* settlements were finalized, the USSC affirmed the Third Circuit's decision to vacate a global class settlement where the federal district court had certified the class for settlement purposes. The *Amchem* class covered plaintiffs who had been exposed to asbestos; the plaintiffs included people who had already manifested personal injury **and** those who had not yet manifested any affliction; this latter group was labeled the "exposure-only" plaintiffs.

Initially, the *Amchem* court made clear that while settlement is certainly relevant to a trial court's decision to certify a class, the other requirements for certification under Rule 23, Fed.R.Civ.P., must still be given appropriate, and even heightened, attention because they are specifically designed to bind and protect absent class members. *Id.* at 619–21, 117 S.Ct. 2231. The court also clearly stated that the overall fairness of a settlement is no substitute for Rule 23's certification criteria. *Id.* at 622, 117 S.Ct. 2231.[16]

With respect to adequate representation, the *Amchem* court stated that the adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Id.* at 625, 117 S.Ct. 2231. Significantly, a class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 625–26, 117 S.Ct. 2231 (internal quotations and citations omitted). Furthermore, "[t]he adequacy heading also factors in competency and conflicts of class counsel." *Id.* at 626 n. 20, 117 S.Ct. 2231.

---

**16.** *See also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 863–64, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) ("the settlement's fairness under Rule 23(e) does not dispense with the requirements of Rules 23(a) and (b)"). The USSC's decision in *Ortiz*, decided two years after *Amchem*, reiterated many of the significant holdings of *Amchem*.

On the merits of the adequate representation issue, *Amchem* found serious problems with the global class settlement. First, the named parties had "diverse medical conditions" but nevertheless "sought to act on behalf of a single giant class rather than on behalf of discrete subclasses." *Id.* at 626, 117 S.Ct. 2231. In addition, the USSC found it significant that the currently injured plaintiffs' interest in "generous immediate payments" would be adverse to the exposure—only plaintiffs' interest "in ensuring an ample, inflation—protected fund for the future." *Id.* The *Amchem* court also was troubled by certain terms of the settlement, *to wit,* it included no adjustment for inflation and only a few claimants per year could opt out at the back end. Thus, the court stated the global settlement had "no **structural assurance** of fair and adequate representation for the diverse groups and individuals affected." *Id.* at 627, 117 S.Ct. 2231 (emphasis added).

Appellants argue that, pursuant to *Amchem,* there was inadequate representation, and therefore *Spencer* and *Cox* should not be given full faith and credit. Respondents argue that *Amchem* is not appropriately considered on this issue because it involved a direct appeal, rather than a collateral review as in this case. Along the same lines, respondents also contend that *Amchem* cannot be retroactively applied to *Spencer* and *Cox,* both of which were finalized in 1995, when *Amchem* was decided in 1997.

■ Given our limited scope of review, we need not address the merits of appellants' arguments on adequate representation. In addition, we believe the arguments raised by respondents on *Amchem's* applicability do not require resolution for our limited review. Instead, we find it is patent that both the *Spencer* and *Cox* courts had procedures in place to ensure adequate representation. For example, the *Spencer* court made preliminary findings regarding the adequacy of the named plaintiff representatives and the qualifications of counsel. Moreover, many of appellants' allegations regarding the actions of class counsel were expressly raised at the *Spencer* fairness hearing. Finally, the final order in *Spencer* stated that the settlement was fair, adequate and reasonable to the members of the class. The *Cox* court responded specifically to various objections to class counsel's alleged conflicts of interest and found such allegations to be without

factual support. Indeed, the court commented on class counsel's professionalism in protecting and promoting the interests of the class. The court further noted that the $45 million in attorneys' fees represented only approximately 5% of the settlement fund and were not deducted from the settlement fund. The court in *Cox* specifically stated that "the Agreement is the result of good faith, arms-length, and non-collusive negotiations." Finally, we note the *Cox* court also found that the settlement class met the adequacy requirements of Tennessee's class action rule.

We find there obviously were procedures in place to ensure adequate representation in both *Spencer* and *Cox*, and that such procedures were implemented throughout. Accordingly, these court findings survive our limited collateral review. Furthermore, it is important to observe that we agree with the *Fine v. America Online* court's view that "[m]ere disagreement with the terms of a settlement cannot provide grounds for a collateral attack" on a class settlement. 743 N.E.2d at 423.

## CONCLUSION

In sum, we find that the proper scope of collateral review of a rendering court's rulings on the due process requirements for binding absent class members is one **limited** to a consideration of whether the **procedures** in the prior litigation allowed a full and fair opportunity to litigate the due process issues. It is our opinion that such procedures were not only in place in *Spencer* and *Cox*, but were also consciously and steadfastly utilized to accord minimum due process to the absent class members. Consequently, we hold the trial court correctly accorded full faith and credit to the *Spencer* and *Cox* orders approving the nationwide settlements and properly granted summary judgment to respondents.

**AFFIRMED.**

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur.